IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————

IN RE NATURAL RESOURCES DEFENSE COUNCIL, INC.,
PETITIONER

————————

On Petition for a Writ of Mandamus and for Relief from Unreasonably Delayed
Agency Action by the Environmental Protection Agency

————————

**PETITION FOR A WRIT OF MANDAMUS**

————————

Kimberly Leefatt
Lena Freij
Natural Resources Defense Council
1314 2nd Street
Santa Monica, CA 90401
310-434-2357
kleefatt@nrdc.org
lfreij@nrdc.org

Simi Bhat
Natural Resources Defense Council
111 Sutter St., 21st floor
San Francisco, CA 94104
415-875-6110
sbhat@nrdc.org

*Counsel for Petitioner*

# CERTIFICATES AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to District of Columbia Circuit Rule 28(a)(1), petitioner Natural Resources Defense Council, Inc. certifies as follows:

## A.    Parties

Natural Resources Defense Council, Inc. is the petitioner in this case. Lee Zeldin, in his official capacity as Administrator of the U.S. Environmental Protection Agency, and the U.S. Environmental Protection Agency are the respondents in this case.

## B.    Rulings Under Review

This petition challenges Administrator Zeldin's unreasonable delay in answering Natural Resources Defense Council's petition for the agency to revoke all food tolerances for neonicotinoid pesticides, submitted over 5 years ago.

## C.    Related Cases

There are no cases related to this petition.

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Petitioner Natural Resources Defense Council, Inc., submits this Corporate
Disclosure Statement pursuant to Federal Rule of Appellate Procedure 26.1 and
District of Columbia Circuit Rule 26.1. Natural Resources Defense Council has no
parent, subsidiary, or affiliate that has issued shares or debt securities to the public.
Natural Resources Defense Council is a not-for-profit, tax-exempt membership
organization that advocates for policies that protect public health and the
environment, including through administrative petitions and litigation.

# TABLE OF CONTENTS

CERTIFICATES AS TO PARTIES, RULINGS, AND RELATED CASES ............ ii

RULE 26.1 CORPORATE DISCLOSURE STATEMENT ...................................... iii

TABLE OF AUTHORITIES ............................................................................ vi

GLOSSARY ................................................................................................... ix

INTRODUCTION ............................................................................................1

STATEMENT REGARDING ADDENDA .............................................................3

STATEMENT OF JURISDICTION AND APPLICABLE LAW ..............................3

STATEMENT OF ISSUES PRESENTED FOR REVIEW .......................................4

BACKGROUND ..............................................................................................4

    I.    Legal Background ...............................................................................4

    II.   Neonic exposure in adults and children is nearly unavoidable ............5

    III.  NRDC petitions EPA to revoke all neonic food tolerances .................8

SUMMARY OF ARGUMENT ..........................................................................10

STANDING ...................................................................................................11

ARGUMENT ..................................................................................................15

    I.    EPA Has a Legal Duty to Respond to the 2020 Petition ....................15

    II.   A Writ of Mandamus or an Order compelling agency action is justified under the equitable factors established in TRAC ................16

        A.   EPA's five-year delay in resolving the 2020 Petition is unreasonable ...........................................................................17

        B.   EPA's delay is unreasonable in light of the statutory scheme ...19

        C.   The significant human health interests at issue underscore that EPA's delay is unreasonable ..............................................22

        D.   EPA has no other reason to justify the delay .............................26

III.    The Court should grant a writ of mandamus and retain jurisdiction to ensure that EPA timely resolves the petition by a date certain ...........26

CONCLUSION .........................................................................................29

CERTIFICATE OF COMPLIANCE .........................................................31

CERTIFICATE OF SERVICE ...................................................................32

# TABLE OF AUTHORITIES

Authorities upon which we chiefly rely are marked with asterisks.

## Cases

*Air Line Pilots Ass'n v. Civil Aeronautics Board*,
 750 F.2d 81 (D.C. Cir. 1984) ........................................................18

*Biodiversity Legal Found. v. Norton*,
 285 F. Supp. 2d 1 (D.D.C. 2003) ..............................................29

*Cutler v. Hayes*,
 818 F.2d 879 (D.C. Cir. 1987) ..................................................20

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*,
 528 U.S. 167 (2000) ..................................................................11

*Fund for Animals v. Norton*,
 294 F. Supp. 2d 92 (D.D.C. 2003) ............................................18

*Hunt v. Wash. State Apple Adver. Comm'n*,
 432 U.S. 333 (1977) ............................................................ 12, 14

*In re A Community Voice*,
 878 F.3d 779 (9th Cir. 2017) ....................................................17

*\*In re Am. Rivers & Idaho Rivers United*,
 372 F.3d 413 (D.C. Cir. 2004) ................................ 16, 17, 18, 26

*In re Bluewater Network*,
 234 F.3d 1305 (D.C. Cir. 2000) ................................................19

*In re Core Commc'ns, Inc.*,
 531 F.3d 849 (D.C. Cir. 2008) ..................................................17

*\*In re Ctr. for Biological Diversity*,
 53 F.4th 665 (D.C. Cir. 2022) ........................................ 15, 18, 28

*In re Int'l Chem. Workers Union*,
 958 F.2d 1144 (D.C. Cir. 1992) ................................................19

*In re NRDC*,
 956 F.3d 1134 (9th Cir. 2020) ..................................................24

*In re Pesticide Action Network N. Am. v. U.S. EPA*,
 798 F.3d 809 (9th Cir. 2015) ............................................ 16, 28

*In re UMW Int'l Union*,
 190 F.3d 545 (D.C. Cir. 1999) ..................................................28

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)..................................................................12

*Mashpee Wampanoag Tribal Council, Inc. v. Norton*,
    336 F.3d 1094 (D.C. Cir. 2003) ...................................16

*MCI Telecomms. Corp. v. FCC*,
    627 F.2d 322 (D.C. Cir. 1980) .....................................18

*N. States Power Co. v. U.S. Dep't of Energy*,
    128 F.3d 754 (D.C. Cir. 1997) .....................................15

*\*Pub. Citizen Health Rsch. Grp. v. Auchter*,
    702 F.2d 1150 (D.C. Cir. 1983) ....................... 18, 24, 26

*Pub. Citizen Health Rsch. Grp. v. Brock*,
    823 F.2d 626 (D.C. Cir. 1987) .....................................28

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009)...................................................12

*\*Telecomm. Rsch. & Action Ctr. (TRAC) v. FCC*,
    750 F.2d 70 (D.C. Cir. 1984) ................... 3, 4, 17, 20, 23

*Telecomms. Rsch. & Action Ctr. v. Allnet Commc'n Servs., Inc.*,
    806 F.2d 1093 (D.C. Cir. 1986) ...................................12

**Statutes**

21 U.S.C. § 331 ............................................................4

21 U.S.C. § 342(a)(1)...................................................4

21 U.S.C. § 346a ........................... 3, 4, 5, 12, 16, 20, 21, 23, 26

28 U.S.C. § 1651(a) .....................................................3

5 U.S.C. § 555(b) ..................................................... 3, 16

*\*5 U.S.C. § 706 ...........................................................3

7 U.S.C. § 136(bb) .....................................................21

7 U.S.C. § 136a(a).....................................................5, 9

7 U.S.C. § 136a(c)(5)..................................................21

7 U.S.C. § 136a(g)(1)(A)(iv)........................................27

**Regulations**

40 C.F.R. § 155.56 .......................................................9

40 C.F.R. § 180.472 ....................................................4

40 C.F.R. § 180.565 ..................................................................4

40 C.F.R. § 180.578 ..................................................................4

40 C.F.R. § 180.586 ..................................................................4

40 C.F.R. § 180.603 ..................................................................4

**Other Authorities**

85 Fed. Reg. 45883 (Jul. 30, 2020).........................................9

90 Fed. Reg. 31,894 (Jul. 16, 2025)......................................22

# GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| EPA or Agency | Environmental Protection Agency |
| FIFRA | Federal Insecticide, Fungicide, and Rodenticide Act |
| FFDCA | Federal Food, Drug, and Cosmetic Act |
| FQPA | Food Quality Protection Act of 1996 |
| NRDC | Natural Resources Defense Council |
| Neonics | Neonicotinoids |

**INTRODUCTION**

The U.S. Environmental Protection Agency (EPA) has taken too many years to respond to the Natural Resources Defense Council's (NRDC) petition to protect children from neonicotinoid ("neonic") pesticides in their food. Congress prohibited any pesticide residues on or in food unless EPA established "tolerances" that limit exposure—through consumption—to "safe" levels that with reasonable certainty will cause *no* harm. NRDC's 2020 Petition—which EPA has failed to respond to for five years—requests changes to the current tolerances for neonics because they are not safe, especially for children.

Neonics are neurotoxins designed to attack the same nerve sites in the brain and central nervous system that respond to nicotine. Exposure as an adult can lead to neurological symptoms, though neonics are particularly pernicious for developing fetuses and children. As neurotoxins, neonics can cause neurological and developmental damage when exposure occurs in the womb or during critical periods of brain development in early childhood. Congress ordered EPA to consider children's sensitivities during developmental windows when setting tolerances. However, EPA did not consider these sensitivities when it evaluated the current tolerances for neonics. EPA now refuses to respond to NRDC's 2020 Petition, which called out this failure over five years ago.

As the most-used class of insecticides, neonics and their residues can be found on many of our favorite fresh produce. Apples, cherries, grapes, leafy greens, cucumbers and potatoes—all commonly consumed by children to support their growing bodies—are some of the foods with the greatest amounts of neonic residues. Because these pesticides are absorbed by the plant, including its edible parts, they cannot be washed off or peeled away. The plant becomes infused with the chemicals, which are then unavoidably eaten.

People are exposed to neonics not only through food, but also through drinking water; pets treated with flea and tick products that contain neonics; and neonics used around lawns, gardens, and playgrounds. These are cumulative exposures that EPA also failed to assess, as required by law. As nerve damage is often permanent, these chronic and compound exposures pose the ever-growing risk of injury, most acutely to the nervous systems of children exposed early and often throughout sensitive periods of development.

There is no question that EPA is required to respond to NRDC's petition. A response from EPA is even more urgently needed now—as recent studies are detecting neonics in pregnant people's bodies across the country, and evidence of neonics' neurotoxic, neurodevelopmental, and endocrinological harm has mounted since NRDC's petition was submitted. This Court should order EPA to promptly

respond to NRDC's 2020 Petition. EPA's five-year silence is both unreasonable and dangerous.

## STATEMENT REGARDING ADDENDA

Relevant statutes and regulations, and supporting declarations and exhibits, are submitted with this brief as separate addenda.

## STATEMENT OF JURISDICTION AND APPLICABLE LAW

This Court has jurisdiction, and venue is proper. NRDC filed its administrative petition to revoke tolerance for neonics pursuant to 21 U.S.C. § 346a(d)(1)(A). If EPA withholds a decision on a petition, as it has done here, petitioners may seek judicial review to compel the agency to act. The All Writs Act authorizes courts to issue writs of mandamus "in aid of their respective jurisdictions." 28 U.S.C. § 1651(a). The Administrative Procedure Act also requires that an agency "conclude" a matter presented "within a reasonable time," 5 U.S.C. § 555(b), and authorizes courts to "compel agency action . . .unreasonably delayed," *id.* § 706. Where review of final agency action is committed by statute to a Court of Appeals, jurisdiction to review agency inaction also lies exclusively with the same courts. *Telecomm. Rsch. & Action Ctr. (TRAC) v. FCC*, 750 F.2d 70, 75 (D.C. Cir. 1984). Review of EPA's decisions on pesticide residue tolerance petitions is reviewable in this Court, 21 U.S.C. § 346a(h)(1), and so are

unreasonable delay claims on those petitions. *TRAC*, 750 F.2d at 76-79 (allowing review to protect courts' future jurisdiction).

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

Whether EPA's failure to respond for more than five years to NRDC's 2020 Petition to revoke all food tolerances for neonicotinoids constitute an unreasonable delay such that this Court should order EPA to respond.

## BACKGROUND

### I. Legal Background

The Federal Food, Drug and Cosmetic Act (FFDCA), as amended by the Food Quality Protection Act (FQPA), establishes, as a general rule, that "any pesticide chemical residue" on food is "unsafe," unless EPA sets a "tolerance"— the maximum amount of that pesticide chemical residue that can be left on food at a "safe" level. 21 U.S.C. § 346a (a)(1), (b)(2)(A). If EPA has not set a tolerance and no exemption is in effect, foods with pesticide chemical residues are considered "adulterated" and prohibited from sale in interstate commerce. *Id*. §§ 346a(4), 342(a)(1), 331. EPA has set tolerances for the five neonic chemicals at issue in NRDC's 2020 Petition—acetamiprid, clothianidin, dinotefuran, imidacloprid, and thiamethoxam. *See* 40 C.F.R. §§ 180.578, 180.586, 180.603, 180.472, 180.565. These chemicals are used as active ingredients in several registered pesticides.

A tolerance is "safe" if, based on "reliable information," there is a "*reasonable certainty that no harm* will result from *aggregate exposure* to the pesticide chemical residue, including *all anticipated dietary* exposures and all other exposures." 21 U.S.C. § 346a(b)(2)(A)(ii) (emphasis added). In calculating this reasonable certainty, the FQPA amendments to the FFDCA directed EPA to account for the "special susceptibility of infants and children" by applying an "additional tenfold margin of safety." *See id.* § 346a(b)(2)(C)(ii). This "child-protection factor" is applied by default to account for children's heightened vulnerability during critical times of brain development, adding protection against even low-level pesticide exposure that can cause lasting neurological harm. *See id.*; Sass Decl. ¶ 12, 13, 32, 34, 35. The only circumstance when EPA "may use a different margin of safety"—i.e., less than "tenfold"—for a particular pesticide chemical, is if "on the basis of reliable data, such margin will be safe for infants and children." 21 U.S.C. § 346a(b)(2)(C)(ii); Sass Decl. ¶ 12.

## II.    Neonic exposure in adults and children is nearly unavoidable

Neonics are the most widely used insecticides in the United States. The first pesticide product containing the neonic chemical, imidacloprid, was registered for use in 1994, pursuant to the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), 7 U.S.C. § 136a(a). Since then, over 1,000 products containing

imidacloprid or other neonicotinoids have been registered for use in agriculture, urban landscaping, and pet pest control. Sass Decl. ¶ 16.[1]

Neonics have been detected in apples, cherries, grapes, kale, tomatoes, lettuce, pears, potatoes, celery, kale, collard greens, strawberries, cauliflower, summer squash, watermelon and spinach—all staples in the diets of pregnant women and children. Some tested crops contained multiple neonics, and others contained neonics at levels that exceed current tolerances. Sass Decl. ¶¶ 17-18. Two or more neonic chemicals have been detected in peach, pear, and applesauce-based baby foods. As neonics permeate foods by design, neonics also cannot typically be washed off or peeled away from the fruits and vegetables they contaminate. *Id.*

Drinking water also presents a significant exposure concern. After neonic-containing pesticides are applied to fields and landscaping, neonic chemicals that are not taken up by the plants move into our water supply via runoff after rain events or irrigation. Sass Decl. ¶¶ 21-24. Neonics dissolve easily in water, and conventional water treatment does not generally remove neonics from contaminated water. So neonic exposure occurs by way of infant formula reconstituted with contaminated tap water, as well. *Id.*

---

[1] Declaration of Dr. Jennifer Sass is attached as Attachment 2 in Petitioner's Supplemental Materials, Volumes II-III.

The 2020 Petition identified an alarming number of incidences of acute human poisoning from neonics in the United States. 2020 Petition, Attachment 1 at 8–10. The observed neurological toxicity symptoms from neonic exposure in adults include nausea and vomiting, abdominal pain, headache, drowsiness, dizziness, disorientation, loss of muscle control, weakness, seizures, and muscle tremors. Sass Decl. ¶ 25.

Exposures to neurotoxic chemicals like neonics during early neurodevelopment raise particularly significant health concerns for children because their brains and nervous systems have not yet fully developed. Sass Decl. ¶¶ 31-32, 34-35. During pregnancy, the fetus has little to no protection against neurotoxic chemicals, as they pass from the mother to the developing fetus. Sass Decl. ¶¶ 28-31, 32, 35. Whereas for an adult, exposure to neurotoxins will disrupt the existing nervous system and the functions it controls, children face a far more grave impact: misdirected neurodevelopment. Sass Decl. ¶¶ 32-33, 35. Studies have shown that neonics can pass easily from mother to fetus in blood circulation, can pass to a child through breast milk, and can easily pass through the blood brain barrier to affect the brain in early childhood. Sass Decl. ¶¶ 20, 28-30 (explaining how neonics operate). For children, both during fetal development and in early childhood, neonic exposure fundamentally alters how the central nervous system grows and develops. Sass Decl. ¶¶ 20, 32.

Exposure to neurotoxic chemicals during these critical neurodevelopmental stages, even at low levels or for only a short time, threatens long lasting or even permanent changes to the structure of the nervous system—leading to physical, cognitive, and behavioral impairments. Sass Decl. ¶¶ 34-38.

## III. NRDC petitions EPA to revoke all neonic food tolerances

On May 4, 2020, NRDC petitioned EPA to revoke all food tolerances for residues of five neonics—acetamiprid, clothianidin, dinotefuran, imidacloprid, and thiamethoxam—until the agency properly assessed the toxicity of these active ingredients (2020 Petition).[2] In the 2020 Petition, NRDC explained that neonics are developmental neurotoxicants, and that errors underpinning EPA's analysis leave the current tolerance levels for neonics unacceptably high. Sass Decl. ¶¶ 39-40. First, EPA disregarded evidence of harm in its calculations of the Reference Doses. Sass Decl. ¶¶ 8-11, 41. More importantly, the 2020 Petition challenged EPA's decision to impermissibly waive the child-protection factor prescribed by the FQPA, without satisfying the evidentiary conditions prescribed by law. Sass Decl. ¶ 42. The 2020 Petition also challenged the agency's refusal to assess the cumulative harm caused by exposure to all neonic chemicals (as a class), against

---

[2] NRDC Neonic Petition, Docket EPA-HQ-OPP-2020-0306, https://www.regulations.gov/docket/EPA-HQ-OPP-2020-0306 (last visited October 28, 2025). The 2020 Petition is included as Attachment 1 in Petitioner's Supplemental Materials addendum, Volume I.

the agency's own guidance. Sass Decl. ¶¶ 44-47. EPA published notice of NRDC's Petition in the Federal Register on July 30, 2020, and the comment period on the petition ended on August 31, 2020. Notice of Availability, 85 Fed. Reg. 45883 (Jul. 30, 2020).

NRDC requested a response to its 2020 Petition for neonic tolerances "as soon as practicable," or no later than completion of registration review under FIFRA, 7 U.S.C. § 136a(a), for neonic-containing pesticides, which at the time was anticipated to occur by 2022. For background, every fifteen years, EPA must decide whether neonic-containing pesticides remain compliant with FIFRA in a process called registration review. The final registration review decisions may order changes to how neonic-containing pesticides can be used based on new scientific information. 40 C.F.R. § 155.56. Registration review for neonic-containing pesticides initially began between 2008 and 2012, and EPA issued proposed interim decisions for neonic-containing pesticides in February 2020.[3]

EPA announced during one of its 2025 quarterly Office of Pesticides Programs meetings that it is planning to respond to the 2020 Petition at the same time as it finalizes interim decisions for registration review for neonic-containing

---

[3] Proposed Interim Registration Review Decision for Neonicotinoids, https://www.epa.gov/pollinator-protection/proposed-interim-registration-review-decision-neonicotinoids (last visited October 8, 2025).

pesticides. Raichel Decl. ¶ 7.[4] Originally, EPA anticipated issuing amended proposed interim decisions in 2023, followed by final interim decisions in 2024. Raichel Decl. ¶ 9. EPA missed those dates, and in July 2024 revised its timeline for the proposed interim decisions, saying it expected to finalize them this year—2025. *Id.* EPA then communicated another delay, indicating final interim decisions will happen "next year," in 2026. Raichel Decl. ¶ 7. Now, EPA has announced it no longer has plans to complete registration review or respond to NRDC's 2020 Petition until *after* 2026. Rhoads Decl. ¶ 4.[5] EPA's official schedule for neonic registration review has not been updated to reflect these additional, anticipated delays. Raichel Decl. ¶ 9. The 2020 Petition remains unanswered, and the interim decisions have not been finalized, as of this filing.

## SUMMARY OF ARGUMENT

EPA's continued failure to respond to NRDC's 2020 Petition is unreasonable. The egregiousness of EPA's delay and the significant health risks at issue warrant the Court's intervention. Five years of silence is unacceptable, especially given that the health assessments needed to respond have been completed. The unreasonableness of EPA's delay is underscored by the risks of

---

[4] Declaration of Daniel Raichel is attached as Attachment 6 in Petitioner's Supplemental Materials, Volume IV.
[5] Declaration of Lucas Rhoads is attached as Attachment 7 in Petitioner's Supplemental Materials, Volume IV.

neonics to the public, including to NRDC members. NRDC members are concerned about their children, whose developing brains are susceptible to permanent neurological damage from neonic exposure. NRDC's 2020 Petition presented evidence of alarming neurodevelopmental impairments from exposure to neonics. New research further substantiates the 2020 Petition's assertions that exposure to neonics can increase the risk of neurodevelopmental harm that may be long-lasting or even permanent. EPA has no excuse, having publicly stated that it has sufficient staff to complete all of its statutory duties. A writ of mandamus should be granted to end this unreasonable administrative limbo.

## STANDING

NRDC has standing because EPA's unreasonable delay in answering the 2020 Petition is a procedural violation linked to a concrete and continuing harm to NRDC's members.

To satisfy Article III, a petitioner must show "(1) it has suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180-81 (2000). A party that "has been accorded a procedural right to protect his concrete interests can assert that right

without meeting all the normal standards for redressability and immediacy." *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) (cleaned up); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 573 n.8 (1992) ("We do *not* hold that an individual cannot enforce procedural rights; he assuredly can, so long as the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing." (emphasis in original)).

EPA's failure to respond to the 2020 Petition is a cognizable procedural injury that a writ from this Court can remedy. The 2020 Petition was submitted pursuant to a specific statutory mechanism that triggered EPA's duty to review the protective nature of existing food tolerances. EPA's duty to respond to NRDC's Petition is prescribed by statute, *see* 21 U.S.C. § 346a(d)(4)(A), and EPA's failure to discharge that duty has harmed NRDC, which is still awaiting a response and the regulatory actions that may follow.

This procedural injury threatens the concrete interests of NRDC's members, through whom NRDC satisfies the requirements for associational standing. *See Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977); *Telecomms. Rsch. & Action Ctr. v. Allnet Commc'n Servs., Inc.*, 806 F.2d 1093, 1094 (D.C. Cir. 1986). NRDC's members are particularly harmed by EPA's failure to respond to the 2020 Petition. The 2020 Petition requests that EPA properly apply a legally-mandated margin of safety for risks to children in setting food tolerances for

neonics—chemicals with neurotoxic effects that are especially concerning when exposure occurs early in life. 2020 Petition, Attachment 1 at 31. Some NRDC members have young children and are concerned about their exposure to neonics. Cullen Decl. ¶ 8; Taurog Decl. ¶¶ 11-12.[6] Those members' children should be protected by this statutory child-protection factor, and, as detailed in the 2020 Petition, EPA's failure to apply this factor exposes children to more pesticide residue and unacceptable risk of harms from neonic exposure. Sass Decl. ¶¶ 41-48.

Even parents who are aware of the risks of neonics are unable to completely protect their children from exposure to neonics, because there is often no way to know whether food or water served to them outside their homes—such as at daycare, school, and parties and gatherings—contain neonics. Cullen Decl. ¶¶ 5-8; Taurog Decl. ¶¶ 6-8, 10. NRDC members have infants who drink formula mixed with tap water that could contain neonics. Cullen Decl. ¶ 6. Some members find that the only way to avoid neonics is to purchase organic foods for their entire family, which is an expensive financial burden. Cullen Decl. ¶ 4; Taurog Decl. ¶¶ 6, 8. Some members are forced to purchase non-organic foods contaminated with neonics due to their financial circumstances or their children's food aversions. Taurog Decl. ¶ 7. Other members purchase non-organic because that is all that is

---

[6] Declarations of Alexandra Cullen and Rebecca Taurog are attached as Attachments 4 and 5, respectively, in Petitioner's Supplemental Materials, Volume IV.

available when they are shopping or to fulfill other health requirements. Cullen Decl. ¶ 4 (explaining some organic options available to her are high in sugar for snacks); *see also* Taurog Decl. ¶ 9 (shopping locally because that is most inexpensive option). Members often do not have organic options when dining in restaurants, purchasing from food trucks, and eating at roadside food stops during family outings. Cullen Decl. ¶ 5.

NRDC's members would have standing to sue in their own right because of the injuries described above. These member interests are germane to NRDC's purpose. Trujillo Decl. ¶¶ 7-8.[7] As an environmental action and human health organization with hundreds of thousands of members nationwide, one of NRDC's organizational priorities is reducing and eliminating human exposure to dangerous chemicals, including pesticides in food. *Id.* NRDC has a right to have the concerns of their members regarding neonics addressed through EPA's petition process by receiving a response required by law. The litigation will not require the participation of the individual members. *See Hunt*, 432 U.S. at 344.

EPA's unreasonable delay in answering the 2020 Petition is a procedural injury linked to a concrete harm that gives NRDC standing to petition this Court

---

[7] Declaration of Gina Trujillo is attached as Attachment 3 in Petitioner's Supplemental Materials, Volume IV.

for relief. A writ of mandamus compelling the EPA to take final action would redress the harm suffered by NRDC members.

## ARGUMENT

EPA's failure to respond to NRDC's 2020 Petition for more than five years is unreasonable. The facts of this case satisfy the test for granting a writ of mandamus because EPA has a non-discretionary duty to respond to the 2020 Petition, five years of delay violates the rule of reason, and the risks of EPA's inaction to the public's health—particularly children—are urgent, necessitating a response by EPA immediately.

## IV.     EPA Has a Legal Duty to Respond to the 2020 Petition

A court may grant mandamus relief if (1) the plaintiff has a clear right to the relief requested; (2) the defendant has a "clear duty" to perform the act in question; and (3) there is "no other adequate means" for the plaintiff to attain relief. *N. States Power Co. v. U.S. Dep't of Energy*, 128 F.3d 754, 758 (D.C. Cir. 1997); *see also In re Ctr. for Biological Diversity*, 53 F.4th 665, 670 (D.C. Cir. 2022) (internal quotation omitted).

Here, EPA has a clear duty to respond to NRDC's petition, and NRDC has a clear right to relief. The FFDCA lays out a process by which groups like NRDC can file a "petition proposing the issuance of a regulation . . . establishing, modifying, or revoking a tolerance for a pesticide chemical residue in or on a

food." 21 U.S.C. § 346a(d)(1)(A). EPA "shall" respond by either issuing a final regulation, a proposed regulation, or denying the petition. *Id.* § 346a(d)(4)(A).

This duty to respond is also established by the Administrative Procedure Act, which requires the agency to issue final decisions within a reasonable time. *See* 5 U.S.C. § 555(b). This "general but nondiscretionary duty," *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1099 (D.C. Cir. 2003), extends to administrative petitions that request discretionary action, *In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 418-19 (D.C. Cir. 2004). NRDC is entitled to a "final ruling" on its petition—i.e., a "formal action to grant or deny it." *In re Pesticide Action Network N. Am. v. U.S. EPA*, 798 F.3d 809, 813-14 (9th Cir. 2015).

NRDC also has no other adequate remedy at law. The FFDCA gives a petitioner the right to object to any regulation or order made in response to the petition. 21 U.S.C. § 346a(g)(2)(A). But because there has been no response, NRDC has no administrative recourse. And without a final agency action on the 2020 Petition, NRDC cannot exercise its right to judicial review of EPA's response. Therefore, a writ of mandamus requiring EPA to issue a response is the only legal remedy available.

**V.    A Writ of Mandamus or an Order compelling agency action is justified under the equitable factors established in TRAC**

In judging whether to compel agency action or issue a writ of mandamus, in the face of unreasonable delay, this Court has established a flexible, six-factor test:

> (1) the time agencies take to make decisions must be governed by a rule of reason; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.

*TRAC*, 750 F.2d at 80 (cleaned up); *see also In re Core Commc'ns, Inc.*, 531 F.3d 849, 855 (D.C. Cir. 2008). Applying these factors, EPA's five-year delay to respond to a request to protect the health and well-being of Americans, especially children, from the most widely used insecticides in the country is unreasonable and warrants mandamus.

### A.     EPA's five-year delay in resolving the 2020 Petition is unreasonable

The most important TRAC factor is the "rule of reason." *In re A Community Voice*, 878 F.3d 779, 786 (9th Cir. 2017) (citing *In re Core Commc'ns*, 531 F.3d at 855). There is no per se rule to decide how long is too long to wait for agency action. *In re Am. Rivers & Idaho Rivers United*, 372 F.3d at 419. However, it is well settled that reasonableness is counted in months, not years. *Id.*

EPA's delay here has been longer than other delays this Court has found unacceptable. *See*, *id.* at n.12 (explaining some delays of less than five years that the court has found unreasonable). This Court has ordered a response to a petition when three years had passed where human health was at risk. *See Pub. Citizen Health Rsch. Grp. v. Auchter*, 702 F.2d 1150, 1154, 1157 (D.C. Cir. 1983) (noting that "a more than three-year span from [the] petition to projected final regulation is not tolerable" and constitutes "agency action unreasonably delayed"). The court has also found four- and five-year delays unreasonable. *See e.g.*, *MCI Telecomms. Corp. v. FCC*, 627 F.2d 322, 327, 340-42 (D.C. Cir. 1980) (four-year lapse deemed unreasonable); *Air Line Pilots Ass'n v. Civil Aeronautics Board*, 750 F.2d 81, 86 (D.C. Cir. 1984) (five-year delay unreasonable); *Fund for Animals v. Norton*, 294 F. Supp. 2d 92, 113 (D.D.C. 2003) ([A] five year delay smacks of unreasonableness on its [sic] face."); *In re Ctr. for Biological Diversity*, 53 F.4th at 671-72 (finding five-year delay in responding to a court order unreasonable when health and welfare at risk).

Here, over five years have elapsed since EPA received NRDC's petition. By the time briefing is complete, nearly six years will be lost to EPA's silence—a period of time which this Court has consistently concluded is unreasonable. *See, e.g.*, *In re Am. Rivers & Idaho Rivers United*, 372 F.3d at 420 (six-year delay unreasonable, noting FERC gave no "plea of administrative error, administrative

convenience, practical difficulty in carrying out a legislative mandate, or need to prioritize in the face of limited resources" (internal quotation omitted)); *In re Int'l Chem. Workers Union*, 958 F.2d 1144, 1150 (D.C. Cir. 1992) (per curiam) (six-year delay unreasonable); *see also, e.g.*, *Pub. Citizen Health Research Group v. Brock*, 823 F.2d 626, 628 (D.C. Cir. 1987) (questioning a similar six-year delay that "tread[ed] at the very lip of the abyss of unreasonable delay"); *In re Bluewater Network*, 234 F.3d 1305, 1316 (D.C. Cir. 2000) (nine-year delay unreasonable, in light of a one-year congressional deadline).

The complexity of the tolerance decision process does not excuse EPA's years-long delay. The 2020 Petition requests EPA to take a hard look at its underlying assumptions and reconsider its basis for rejecting the child-protection factor and failure to conduct a cumulative exposure analysis that accounts for people's exposure to multiple neonics. The 2020 Petition itself provides the necessary evidence to do this, Sass Decl. ¶¶ 39-49, and EPA has completed collecting relevant data for its parallel pesticide review processes under FIFRA, which began years ago. EPA has not indicated that it needs any further data to make a decision on NRDC's petition. Sass Decl. ¶ 50.

### B. EPA's delay is unreasonable in light of the statutory scheme

The statutory timelines for implementing and revising food tolerances in FFDCA indicate that the five-plus-year delay here is unreasonable. TRAC provides

that "where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason." *TRAC*, 750 F.2d at 80. EPA's tolerance analysis is a necessary prerequisite in the overall pesticide registration review under FIFRA, underscoring the unreasonableness of this delay.

While the statute provides no specific deadline for responding to petitions, the FFDCA generally requires tolerance review to be swift so as to prevent health risks, especially to children, from remaining unaddressed. When Congress amended the FFDCA through the FQPA, adding the presumptive margin of safety to protect children, Congress also established strict deadlines to complete tolerance review. EPA had ten years to bring all of its pesticide authorizations into compliance with the FQPA's child-protection requirements. 21 U.S.C. § 346a(q)(1)(C). During those ten years, EPA had to show progress (in specific percentages) toward complete review by year three and year six to ensure compliance was reached as "expeditiously as practicable." *Id.* Congress thus expected EPA to act quickly even when the agency's workload included concurrent review of every authorized pesticide. EPA's "inordinate" five-year delay here is stalling protections for children that Congress intended to establish quickly and review efficiently. *Cutler v. Hayes*, 818 F.2d 879, 898 n.156 (D.C. Cir. 1987) ("The court must also estimate the extent to which delay may be undermining the

statutory scheme, either by frustrating the statutory goal or by creating a situation in which the agency is 'losing its ability to effectively regulate at all'".).

A five-year delay is of particular significance in the statutory scheme. The FQPA requires that any decision to "leave in effect or modify" a tolerance must be reviewed after five years, 21 U.S.C. § 346a (b)(2)(B)(v), to ensure compliance with FQPA requirements. Five years is therefore the *longest* time that Congress permits passing without EPA taking a second look at a tolerance even without a petition. Yet more than five years have passed since NRDC presented its evidence that the neonic tolerances are unsafe, and EPA has yet to act.

FIFRA's timing for pesticide registration review of neonics, also indicates that EPA's delay in responding to NRDC's neonic tolerance petition is unreasonable. During initial registration, or registration review of a pesticide, under FIFRA, EPA must determine if the pesticide "will perform its intended function without unreasonable adverse effects on the environment." 7 U.S.C.§ 136a(c)(5). To determine whether a pesticide has "unreasonable adverse effects on the environment", which includes human health, EPA must determine the risks of dietary exposure, as EPA does when setting FQPA tolerances. *See* 7 U.S.C. § 136a(c)(5) (requiring performance without "unreasonable adverse effects on the environment"); *id*. § 136(bb) (defining "unreasonable adverse effects on the environment" to include "human dietary risks from residues" as defined by FQPA's

tolerance standards). According to EPA, the agency must make a decision regarding food tolerances for the active ingredients in a pesticide *before* issuing a final registration decision for those pesticides.[8] The FIFRA process may be contingent on the FQPA process, but not the other way around.[9] In fact, EPA issued a tolerance for acetamiprid this year, using the same methodology (waiving the child-protection factor and a full cumulative assessment) that NRDC challenged in its petition in 2020.[10] Because EPA needs to make a tolerance decision to complete registration review, a response to the 2020 Petition before registration review concludes is reasonable and expected.

C. **The significant human health interests at issue underscore that EPA's delay is unreasonable**

---

[8] EPA, Pesticide Registration Manual: Chapter 11 – Tolerance Petitions https://www.epa.gov/pesticide-registration/pesticide-registration-manual-chapter-11-tolerance-petitions ("Registration of a pesticide is not, however, a prerequisite for establishing a tolerance . . . . A tolerance or the exemption from the requirement of a tolerance must be established for each active and inert ingredient in the formulation before a pesticide can be registered for use on a food or feed crop, or for use in a food processing or storage area.").

[9] EPA just acted in accordance with this understanding of the sequence when it issued a new tolerance level for uses of Acetamiprid on several spices before completing its registration review for pesticides containing this neonic. *See* Acetamiprid; Pesticide Tolerances, 90 Fed. Reg. 31,894 (Jul. 16, 2025).

[10] When EPA set this new tolerance for Acetamiprid, the agency waived the child-protection factor and the cumulative assessment was limited to exposure to Acetamiprid. *See*, *supra*, note 9 at 31,897 (reducing child-protection factor to 1X and only assessing cumulative exposure to only Acetamiprid, but not to other neonics chemicals).

EPA's unreasonable delay is even less tolerable because children's health and welfare are at stake. *TRAC*, 750 F.2d at 80. NRDC petitioned EPA to fulfill the FQPA mandate for neonics. The FQPA requires EPA to limit the amount of pesticide residues that can remain on food based on children's pre- and post-natal sensitivities. These tolerances must be based on health considerations only; no economic factors may be considered. *See generally* 21 U.S.C. § 346a(b)(2). The FQPA requires EPA to set tolerances, in large part, by assuming that children are ten-times more sensitive to pesticides residues than adults, and by assessing the risk from aggregate exposure to all forms of a pesticide chemical. *See* 21 U.S.C. § 346a(b)(2)(C) (prescribing the child-protection factor and aggregate analysis); Sass Decl. ¶¶ 9-12 (describing how the aggregate analysis is conducted). Here, EPA has chosen not to do either for neonics. Sass Decl. ¶¶ 42, 44, 46.

Not only is the FQPA purely health protective, but EPA's decision to waive both of these health directives highlights the urgent need for a response to the 2020 Petition. Every day EPA fails to respond to the 2020 Petition is another day that children are exposed to an elevated amount of neonic residues. Sass Decl. ¶ 43 (explaining the child-protection factor alone would require a reduction in tolerance levels); ¶¶ 41, 43 (including accounting for miscalculations in the reference dose along with the child-protection factor would result in tolerances hundreds of times lower as well); ¶ 47 (explaining EPA's risk analysis requires one cumulative

analysis of exposure to the entire class of neonics, not five individual ones); ¶ 48

(explaining EPA already finds that people are exposed to neonics through their diet

at levels that approach the upper limit that EPA considers "safe").

It is scientifically accepted that elevated exposure can cause irreparable

harm to humans, especially children. *See Auchter*, 702 F.2d at 417-18 (recognizing

it is "undisputed that evidence now available" shows "serious qualitative health

risks" that were "unappreciated" when the agency adopted the previous standards).

Centers for Disease Control and Prevention monitoring finds neonics in half the

U.S. population on any given day, and more recent testing finds them in over 90%

of pregnant women tested nationwide, leading to the reasonable presumption

infants are born with neonics already in their bodies. Sass Decl. ¶ 20. These

statistics become even more alarming in light of scientific research that sheds light

on how effective neonics are at passing to the fetus and affecting children's

nervous systems. Sass Decl. ¶¶ 28, 30. And children exposed to neonics from a

variety of sources after birth whose aggregate exposure have had demonstrative

brain function impacts and nervous system problems. Sass Decl. ¶¶ 32-38. It is

unreasonable to ignore "known dangers" to children's health. *In re NRDC*, 956

F.3d 1134, 1141-42 (9th Cir. 2020). Yet EPA does just that as it sits on NRDC's

Petition. The human health risks, especially to children, are too great to wait any longer for EPA to respond.[11]

These studies, building on those in NRDC's petition, underscore the dangers of continued exposure to neonics while EPA further delays its response to NRDC's petition. Neurological damage is not an unknown risk; neonics are intentionally designed to target the nervous system regardless of the species. The developing brains of children are more affected by this targeted toxicity. Unlike many other pesticides, neonics cannot be washed off of our food. They are not filtered out using traditional water filtration systems. And there is no antidote for neonic poisoning if it is encountered in the environment. The child-protection factor was created to dampen the risk of these irreversible harms, by mandating less exposure, but EPA chose not to apply it despite inadequate evidence that doing so was safe. Sass Decl. ¶ 12, 35. EPA's decision to waive the child-protection factor and forgo a cumulative impact analysis leaves children more exposed than Congress intended, without the ability to take meaningful protective measures. *Auchter*, 702

---

[11] Separately, EPA has increasingly recognized the harms from neonics in its evaluation of poisoning events. Sass Decl. ¶¶ 26-27. In an Updated Occupational Exposure Assessments for Seed Treatment Uses for Three Neonicotinoids, EPA identified several activities that posed elevated risks to workers, including cleaning seed treatment equipment, even when maximum personal protective equipment is used, and issued new handling instructions. EPA has also proposed new use and labeling requirements in the pending proposed interim decision for Imidacloprid, released in 2020, recognizing the risks to children from use on turf.

F.2d at 1157–58 (explaining where there is a grave risk, delay is less tolerable "particularly … when the very purpose of the governing Act is to protect those lives" at risk). The agency's refusal to respond after five years to NRDC's 2020 Petition that calls its analysis to waive Congress's requirements into question cannot be taken lightly.

### D. EPA has no other reason to justify the delay

Requiring EPA to respond to the 2020 Petition should not delay other health- or welfare-protective actions. EPA has recently announced that it can perform all necessary work with fewer staff.[12] *See e.g.*, *In re Am. Rivers & Idaho Rivers United*, 372 F.3d at 419-20 (six-year delay unreasonable, noting FERC did not indicate any need to prioritize in the face of limited resources). This Court should order EPA to respond, even if the response is a denial, as it allows NRDC to submit administrative objections and pursue its legal right to challenge EPA's decision. *See* 21 U.S.C. § 346a(h).

### VI. The Court should grant a writ of mandamus and retain jurisdiction to ensure that EPA timely resolves the petition by a date certain

---

[12] Press Release, EPA Announces Next Phase of Organizational Improvements to Better Integrate Science into Agency Offices, Deliver Clean Air, Land, and Water to All Americans (May 2, 2025), https://www.epa.gov/newsreleases/epa-announces-next-phase-organizational-improvements-better-integrate-science-agency

We request this Court order EPA to issue a final response to the 2020 Petition within 60 days of its order and retain jurisdiction to ensure EPA fulfills its obligation.

EPA recently informed NRDC that the Agency expects to continue delaying its response to the 2020 Petition, alongside further delays of its final decisions in FIFRA registration review, even though its FIFRA registration review deadlines— at which time EPA must have already come to a conclusion about dietary risk—are imminent. Rhoads Decl. ¶ 4. The original deadline for registration review of the pesticides at issue in the 2020 Petition was October 1, 2022. 7 U.S.C. § 136a(g)(1)(A)(iv) (explaining the deadline for registration review is fifteen years after initial registration); *see* Raichel Decl. ¶ 8. In 2023, EPA updated its registration review schedule, projecting that it would finish registration review by October 1, 2026.[13] Raichel Decl. ¶¶ 7-9. We now know that EPA no longer expects to complete registration review in 2026 at all, and that EPA is still tying its timeline to respond to the 2020 Petition to the same timeline as registration review. Rhoads Decl. ¶ 4. Under EPA's plan, then, any delay in completing registration review also delays the Agency's overdue response to the 2020 Petition. EPA must, necessarily,

---

[13] EPA, EPA Publishes Updated Registration Review Schedule (Apr. 10, 2023), https://www.epa.gov/pesticides/epa-publishes-updated-registration-review-schedule#:~:text=Released%20on%20April%2010%2C%202023,of%20pesticides%20in%20registration%20review.

come to a decision on the dietary risks posed by neonics—risks central to the 2020 Petition—before it completes registration review. *See supra* Argument, Section II(B). Ordering EPA to respond to the 2020 Petition within 60 days of the Court's order, is fully consistent with, and even in service of, EPA's separate obligation to complete FIFRA registration review. *See, e.g.*, *In re UMW Int'l Union*, 190 F.3d 545, 554–56 (D.C. Cir. 1999) (explaining a "reasonably definite" schedule would involve concrete proposals for each phase of decision-making).

The Court should also retain jurisdiction to ensure the Court's order is effective. *See, e.g.*, *In re Ctr. for Biological Diversity*, 53 F.4th at 673 (retaining jurisdiction to ensure agency abided by its own proposed schedule). EPA's unreasonable delay and persistent shifting timeline for responding to the 2020 Petition and completing registration review underscores the need for an enforceable deadline to act, and the Court's retention of jurisdiction to enforce that deadline if necessary. *See Pub. Citizen Health Rsch. Grp. v. Brock*, 823 F.2d 626, 629 (D.C. Cir. 1987) (ordering agency to adhere to schedule "[i]n light of the fact that OSHA's timetable representations have suffered over the years from a persistent excess of optimism, we share petitioners' concerns as to the probable completion date of the rulemaking"); *In re Pesticide Action Network N. Am.*, 798 F.3d 809, 811 (9th Cir. 2015) (granting petition and explaining the agency's

"ambiguous plan to possibly issue a proposed rule nearly nine years after receiving the administrative petition," was "too little, too late").

Any suggestion EPA may make about its intention to respond to the 2020 Petition in the future alongside a final FIFRA decision is prone to further delay without a court order and retention of jurisdiction. EPA's timeline can reasonably be expected to continue to slide because the agency's estimated timeline for FIFRA registration review has slipped several times over the last five-plus years. *See Biodiversity Legal Found. v. Norton*, 285 F. Supp. 2d 1, 16-17 (D.D.C. 2003) (explaining agency schedule was not definitive enough to be convincing to relinquish jurisdiction).

EPA's failure for over five years to respond to the 2020 Petition and its constantly shifting timeline underscores the need for the Court to retain jurisdiction.

## CONCLUSION

EPA's failure to respond for more than five years to the 2020 Petition is unreasonable, especially in light of the serious risks that neonics pose to children. NRDC respectfully requests that this Court order EPA to respond to the 2020 Petition within 60 days of the Court's order by either denying the 2020 Petition or issuing responsive rulemakings.

Dated: <u>October 29, 2025</u>

*/s/ Kimberly Leefatt*
Kimberly Leefatt
Lena Freij
Natural Resources Defense Council
1314 2nd Street
Santa Monica, CA 90401
310-434-2357
kleefatt@nrdc.org
lfreij@nrdc.org

Simi Bhat
Natural Resources Defense Council
111 Sutter St., 21st floor
San Francisco, CA 94104
415-875-6110
sbhat@nrdc.org

**CERTIFICATE OF COMPLIANCE**

This petition complies with the with the type-volume limit of Federal Rule of Appellate Procedure 21(d) because it contains 6,707 words. This petition also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft in Times New Roman 14-point font, a proportionally spaced typeface.

Dated: <u>October 29, 2025</u>

*/s/ Kimberly Leefatt*
Kimberly Leefatt

**CERTIFICATE OF SERVICE**

I hereby certify that I have this date served a copy of the foregoing Petition for a Writ of Mandamus and the accompanying statutory addendum and Petitioner's Supplemental Materials (Volumes I-IV) upon all parties by U.S. mail or hand delivery at the following addresses:

Sean Donahue, General Counsel
Environmental Protection Agency
1200 Pennsylvania Avenue NW
Mail Code: 2310A
Washington, DC 20460

Lee Zeldin, Administrator
Environmental Protection Agency
1200 Pennsylvania Avenue NW
Mail Code: 1101A
Washington, DC 20460

Pamela Bondi, Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530


Dated: <u>October 29, 2025</u>

*/s/ Kimberly Leefatt*<br>Kimberly Leefatt